UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAMES CORTEZ MCCOY,

        Plaintiff,

v.                                            Case No. 17-cv-1450-pp

MICHAEL HANNAH,
and CRYSTALINA MONTANO,

        Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 32) AND DISMISSING CASE**

---

    Plaintiff James Cortez McCoy, who is representing himself, filed a complaint alleging that the defendants violated his constitutional rights when he was confined at the Milwaukee County Jail. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on a due process claim against defendants Michael Hannah and Crystalina Montano based on allegations that, as a pretrial detainee, he spent nine months in segregation without getting a hearing. Dkt. No. 15 at 4. The defendants have filed a motion for summary judgment. Dkt. No. 32. The court will grant the motion and dismiss the case.

**I.    Facts**

    The plaintiff was confined in the Milwaukee County Jail as a detainee from July 2, 2016 until May 4, 2018. Dkt. No. 33 at ¶¶2-9. Defendants Hannah and Montano were lieutenants at the jail during that time. Id. at ¶8.

    The plaintiff was "off and on" maximum custody status from approximately July 6, 2016 until April 4, 2017. Id. at ¶10. A lieutenant, or

1

someone higher in command, can assign a jail inmate to maximum custody status. Id. at ¶11. The purpose of maximum custody is to ensure the safety and security of the facility, the inmates and staff; it is not a punitive status. Id. at ¶¶12, 14. Maximum custody restricts certain privileges that inmates housed in a general housing unit would receive. Id. at ¶13. In 2016, inmates on maximum custody were not allowed to receive items from the commissary or to watch television, but they were permitted to make telephone calls and to leave their cells for one hour per day. Id.

A few days after entering in the general population in July 2016, the plaintiff told correctional officers he "felt homicidal and suicidal" and, as a result, he was taken to the special needs unit. Id. at ¶15. After being escorted to his cell in the special needs unit on July 6, 2016, the plaintiff flooded his cell. Id. at ¶20. The plaintiff admits that he flooded his cell and alleges that he did so because the cell walls were dirty with what he identified as feces. Id. at ¶21. The plaintiff had registered his complaint about his cell with a correctional officer who said that she would work on having someone look at or clean the cell. Id. at ¶22. The plaintiff testified in his deposition: "as you know I've been through the system so the thing I can do is try to get the lieutenant to come down so I flooded my cell." Id. at ¶24. The plaintiff said that, about thirty to sixty minutes after arriving in his cell, "I think I put my sheet as far as I recall into my toilet and just stood on the sheet and flushed the toilet a whole bunch of times." Id. at ¶25. In the complaint, the plaintiff alleges that "I flooded [my] cell in order to get out of there." Id. at ¶26. Because of the flooding, correctional

officers were required to come to the plaintiff's cell and move him to another location in the jail. Id. at ¶29.

When the correctional officers arrived at his cell in the special needs unit, the plaintiff exposed himself; he pulled out his penis and masturbated in front of the officers. Id. at ¶30. The plaintiff testified in his deposition that, "yes," he did expose himself to correctional officers. Id. at ¶31. The plaintiff testified that he was probably angry and that he probably swore or something, too. Id. at ¶32. After exposing himself, the plaintiff threatened the corrections staff, saying something like "I will f[ ]k you guys up." Id. at ¶33. Immediately after he did this, the plaintiff was moved into pod 4D, which is a pod that houses inmates who are on pending discipline status, discipline status or maximum custody status. Id. at ¶34. Before removing the plaintiff from the special needs unit, Lt. Montano told him that he was being taken to a disciplinary housing unit, on pending discipline status, for flooding his cell and exposing himself to staff. Id. at ¶35.

On this same day—July 6, 2016—Lt. Montano emailed all jail captains, including Captain William Duckert (not a defendant), to inform them of the plaintiff's unsafe behavior. Id. at ¶36. One of Captain Duckert's main duties at that time was to conduct status reviews of inmates who were classified as maximum custody. Id. at ¶37. Captain Duckert stated in his declaration that after receiving the July 6, 2016 email, he "would have called 'classification'" and "requested that [the plaintiff] be placed on maximum custody status after he served his disciplinary time." Id. at ¶38. Captain Duckert "would not have

3

necessarily noted anywhere that [he] was making this classification decision." Dkt. No. 37 at ¶15.

Inmates can be placed on maximum custody status for conduct that jeopardizes the safety and security of inmates or correctional officers. Dkt. No. 33 at ¶39. If an officer feels that an inmate threatens the overall safety and security of the facility, or if an inmate poses safety concerns within the facility, maximum custody can be ordered. Id. Maximum custody status also is appropriate for inmates who present behavioral problems during current or prior incarcerations, which may include repeated rules violations of the kind that disturb the operations and safety of the jail for other inmates, correctional officers and the inmate himself. Id. at ¶40. Maximum custody status is appropriate for an inmate who threatens staff, spits or exhibits sexual aggression toward staff or other inmates. Id. at ¶41. Inmates can have two classifications simultaneously. Id. at ¶42. Inmates may be on maximum custody and, at the same time, be pending and/or serving disciplinary time. Id.

As a result of the plaintiff's behavior in the special needs unit on July 6, 2016, that same day a correctional officer wrote him up for violating 1) Rule 202 – Use of obscene language to jail staff; 2) Rule 208 – Disobeying verbal or written orders from staff; 3) Rule 212 – Committing any act that disrupts the orderly operation of the jail; 4) Rule 410 – Flooding or causing leakage to cells, walls or floors; and 5) Rule 214 – Indecent exposure. Id. at ¶44. The same day (July 6), Lt. Montano reviewed and signed off on the Rules Violation Report. Id. at ¶45. Once she's signed a Rules Violation Report, it is Lt. Montano's practice

4

to return the form to the corrections officer who drafted it so that the officer can bring copies of the report to the disciplinary pod for distribution to the inmate, and to the Classification Department for maintenance in the inmate's classification file. Id. at ¶46. In the jail, it is not a lieutenant's responsibility to ensure that copies of the Rules Violation Report are distributed accordingly. Id. at ¶47. Rather, the drafting officer is responsible for delivering the report to the disciplinary housing unit, and the officers assigned to that disciplinary housing unit are responsible for providing the inmate with a copy. Id.

In July 2016, it was the jail's practice to conduct due process disciplinary hearings within three days of the corresponding violation the inmate allegedly committed. Id. at ¶48. If a hearing was not held within three days of the alleged violation, the inmate was to be considered "time served," and his status reclassified. Id. at ¶49. The jail's Classification Department is responsible for, among other things, ensuring that disciplinary hearings are conducted within three days of the incident for which the inmate was transferred to disciplinary housing. Id. at ¶50. To accomplish this in July 2016, the Classification Department would have provided classification files with corresponding rules violation forms to the lieutenants so they could conduct due process disciplinary hearings. Id. at ¶51.

The defendants indicate that '[i]nexplicably," the plaintiff did not get a due process hearing within three days. Id. at ¶52. Lt. Hannah began to conduct the plaintiff's disciplinary hearing on July 10, 2016, but when he realized that the plaintiff hadn't gotten the hearing within the required three days, he just

5

"considered" the plaintiff "time served for his violations," and didn't complete the hearing. Dkt. No. 35 at ¶10. If an inmate was considered time served, it was not an exoneration of the rule violation, but an administrative determination that the hearing was not held within the three days permitted by the jail's practice. Dkt. No. 33 at ¶34. Lt. Hannah would have delivered his findings to the Classification Department. Id. at ¶55.

In 2016, the Classification Department was responsible for inputting data into the inmate's file, monitoring when he was to be released from pod 4D and ultimately reassigning him to a different housing unit. Id. at ¶57. The Classification Department also was able to determine if an inmate should be reviewed by a supervisor for placement on maximum custody status after the inmate completed his disciplinary time. Id. While on maximum custody status, the plaintiff was sometimes in pod 4D and sometimes in special needs. Id. at ¶58.

Captain Duckert's review of the plaintiff's jail logs revealed that the plaintiff frequently attempted to spit on staff, attempted to throw or otherwise create disturbances with his feces, urinated out of his cell, flooded or attempted to flood his cell and displayed sexually aggressive behavior. Id. at ¶67. He also made attempts to harm staff. Id. The plaintiff's file indicates that he committed twenty-one minor rule violations while in the jail, which Captain Duckert considered significant.[1] Id. at ¶68.

---

[1] Minor rule violations do not require a formal disciplinary hearing. Id.

6

From August 11, 2016 through January 23, 2017, Captain Duckert conducted nineteen different maximum custody reviews of the plaintiff, while two reviews of the plaintiff were conducted by captains other than Duckert.[2] Id. at ¶59. In 2016, the goal was to conduct weekly reviews of the status of maximum custody inmates, in an effort to get those inmates to commit to safety and follow the jail's rules so that they could be returned to a general housing unit. Id. at ¶60. In a maximum custody status review, the reviewer was to determine if there were any repetitions in violations and to compare past behavior to current behavior. Id. at ¶61. A maximum custody status review included 1) a review of the inmate's classification, which included all disciplinary infractions, notations by officers concerning any movements within the jail, and a history of all previous maximum custody status reviews; 2) a discussion with the inmate to determine if he could refrain from presenting problems that posed safety concerns in the jail; and 3) a discussion with officers assigned to pod 4D to question the inmate's conduct overall and if the inmate committed any rule violations or exhibited conduct that posed concerns about safety that might not be noted within the classification file. Id. at ¶62. Only captains, or higher status jail staff, can remove an inmate from maximum custody status. Id. at ¶63. Typical requirements for removal from maximum custody status include confirmation that an inmate has exhibited safe behavior for about one week and also committed to engaging in safe behavior, and

---

[2] The defendants' summary judgment materials do not include copies of any maximum custody reviews.

following pod rules. Id. As he conducted these reviews, Captain Duckert could not conclude that the plaintiff would refrain from exhibiting behaviors that would pose safety problems and therefore the plaintiff remained on maximum custody status. Id. at ¶64.

From January 23, 2017 through March 2, 2017, the plaintiff was in Mendota Mental Health Institute. Id. at ¶65. When the plaintiff returned to the jail on March 2, 2017, he remained on maximum custody status. Id. at ¶66. The plaintiff asked to be removed from this status, but at the same time continued to commit minor rule violations while housed in pod 4D, which showed he was not yet committed to safety. Id. The plaintiff was removed from maximum custody status on April 4, 2017. Id. at ¶69. Thereafter, he was either on medical monitoring, discipline or housed in general population until his release on May 4, 2018. Id.

The plaintiff did not file any grievances challenging his custody status while he was incarcerated. Id. at ¶74. All inmates are notified of the grievance procedure by receiving a copy of the inmate handbook upon their incarceration. Id. at ¶75. Based on the plaintiff's classification file, he received a copy of the Inmate Handbook on July 20, 2016. Id. at ¶76. If the plaintiff had complained to Lt. Briggs (not a defendant) about believing he was improperly housed in pod 4D, Briggs would have confirmed the date and reason for placement in pod 4D with the 4D officers and relayed that information to the plaintiff. Id. at ¶77.

8

## II. Analysis

    A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Discussion

The defendants contend that they did not violate the plaintiff's due process rights because his maximum custody status was preventative, not punitive. Dkt. No. 34 at 7. They also contend that even if there was a due process violation, the defendants did not cause it and they lack personal involvement in the absence of a due process hearing.[3] Id. at 12.

The plaintiff states that his constitutional rights were violated because he was entitled to a due process hearing but never received one. Dkt. No. 45 at 1, 2. The plaintiff filed a document titled Disputed Statements of Fact, dkt. no. 46, by which he attempts to dispute some of the defendants' proposed facts. For example, the plaintiff says that he was not suicidal on July 6, 2016, but rather that he was homicidal, and he says he was not placed on suicide watch. Dkt. No. 46 at 1-2. The plaintiff also disputes that he was placed on "maximum security for purposes of safety, not for punitive purposes" because the other inmate in the special needs unit who flooded his cell "received nothing at all." Id. at 4. The plaintiff says he wasn't evaluated nineteen times by Captain Duckert and that he has never met Captain Duckert. Id. at 5. The plaintiff has

---

[3] The defendants also state that the plaintiff did not file a grievance about his status while he was on maximum custody status, so did not exhaust the administrative remedies available to him, as required by the Prison Litigation Reform Act. Dkt. No. 34 at 11. Exhaustion is a precondition to suit. See 42 U.S.C. §1997e(a). But the defendants do not describe the remedies available to the plaintiff. While they reference the plaintiff's failure to file any grievance, they have not provided evidence that the plaintiff failed to exhaust his available administrative remedies. Thus, the court will not dismiss the case on exhaustion grounds. See Pavey v. Conley, 544 F.3d 739, 740-41 (7th Cir. 2008) (exhaustion is an affirmative defense that the defendants bear the burden of proving).

10

not cited any record evidence in support of these assertions, so the court cannot consider them as evidence at summary judgment. See Fed. R. Civ. P. 56(c); Civil L.R. 56(b)(2)(B) (E.D. Wis.). The plaintiff also filed a one-page statement of facts, dkt. no. 47, but it does not cite to the record and the court may not consider it at summary judgment. See id.

"[A] pretrial detainee cannot be placed in segregation as punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less." Higgs v. Carver, 286 F.3d 437, 438 (7th Cir. 2002) (citing Bell v. Wolfish, 441 U.S. 520, 535-41 (1979); Rapier v. Harris, 172 F.3d 999, 1002-06 (7th Cir.1999)). However, a pretrial detainee can be "placed in segregation not as punishment, but for managerial reasons" without being entitled to any process. Higgs, 286 F.3d at 438 (citing Bell, 441 U.S. at 535-41); Rapier, 172 F.3d at 1002-06. "Managerial reasons" could include overcrowding, protecting a detainee from himself or other inmates or to protect jail staff from the detainee's "violent propensities." Higgs, 286 F.3d at 438. "[A] particular measure amounts to punishment when there is a showing of express intent to punish on the part of the detention facility officials, when the restriction or condition is not reasonably related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." Rapier, 172 F.3d at 1005.

The defendants assert that the plaintiff was on a nonpunitive, preventative status—maximum custody status—from approximately July 6, 2016 until April 4, 2017, except for when he was at the Mendota Mental Health

11

Institute between January 23, 2017 and March 2, 2017. They state that it "had been ordered by Captain Duckert that the classification department place the plaintiff on maximum custody at the same time that his disciplinary time was pending, and the plaintiff remained on that maximum custody status once he was removed from pending discipline status." Dkt. No. 33 at ¶56. The defendants maintain that the plaintiff was simultaneously on pending discipline status and maximum custody status from July 6 until July 10, and that once the pending disciplinary status was over because of the time-served finding, the plaintiff continued on maximum custody status based on his inability to commit to safety. Dkt. No. 34 at 14.

The record does not support the defendants' contention that that plaintiff was placed on maximum custody status on July 6, 2016. The plaintiff was transferred to the disciplinary housing unit on July 6, on pending discipline status. That day, Captain Duckert says that he would have requested that the plaintiff be placed on maximum custody status *after* he served his disciplinary time for the Rules Violation Report the plaintiff received on July 6. The plaintiff received "time served" on July 10, 2016, which suggests that the plaintiff's maximum custody status began on July 10, 2016, leaving approximately four days (July 6 to July 10) that the plaintiff served on pending discipline status.

Assuming the plaintiff did not begin his maximum custody status until July 10, 2016, the court must consider whether the defendants violated his due process rights because he did not receive a hearing before serving four days on pending discipline status. In Holly v. Woolfolk, 415 F.3d 678, 680 (7th

Cir. 2005), the Court of Appeals for the Seventh Circuit determined that a pretrial detainee who spent two days in solitary confinement without a prior hearing did not state a due process claim. The court analogized the period before the disciplinary hearing to pretrial detention following an arrest and held that the hearing the pretrial detainee received forty-eight hours after his placement in solitary confinement was all the process that was due him. Id. at 681. The court concludes that in this case, the jail was not required to give the plaintiff a hearing before they placed him on pending discipline status. When Lt. Hannah realized that the plaintiff hadn't gotten a hearing within three days of his corresponding rule violation, in violation of jail policy, he considered the plaintiff "time served" and the plaintiff's status changed to maximum custody status. The four days on pending discipline status without a hearing did not violate the plaintiff's due process rights.

The plaintiff bases his claim on the fact that he did not receive a hearing before he was placed in segregation. To establish a right to due process, a pretrial detainee must demonstrate either (1) an "expressed intent to punish on the part of detention facility officials" or (2) that the challenged condition or restriction lacked a reasonable relationship to a legitimate, non-punitive administrative purpose. Bell, 441 U.S. at 538-39; see also Rapier, 172 F.3d at 1005 ("Because the same conduct may be the basis for either nonpunitive, regulatory restrictions or punitive sanctions, it is often important to distinguish between nonpunitive measures and the punitive measures that are subject to due process restrictions.)." In deciding whether a particular measure is

reasonably related to the function of pretrial confinement, the court must be careful to remember that the implementation of such measures is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer their expert judgment in such matters." Rapier, 172 F.3d at 1003 (quoting Bell, 441 U.S. at 540 n.23).

The plaintiff was on maximum custody status from July 10, 2016 until April 4, 2017, except for the eleven days he spent at the Mendota Mental Health Institute. He acknowledges engaging in the behavior that led to his maximum custody status classification—flooding his cell, masturbating in front of officers and threatening staff. The jail's maximum custody status is appropriate for inmates whose conduct jeopardizes the safety and security of inmates and staff. Specifically, maximum custody is appropriate for an inmate who floods his cell, exhibits sexual aggression toward staff or other inmates, threatens staff or spits at staff. The plaintiff has not shown that the defendants intended to punish him, and he has not established that his maximum custody status was arbitrary or not reasonably related to a legitimate, non-punitive, administrative purpose. During the plaintiff's time on maximum custody status, he attempted to spit on staff, attempted to throw or otherwise create disturbances with his feces, urinated out of his cell, flooded or attempted to flood his cell and displayed sexually aggressive behavior. Dkt. No. 33 at ¶67. Captain Duckert reviewed the plaintiff's maximum custody status nineteen

times. A reasonable factfinder could not conclude that the plaintiff's confinement on maximum custody status was punitive, and a hearing was not required for the plaintiff's classification on maximum custody status.

Even if the plaintiff's due process rights had been violated by the lack of a hearing before his placement on maximum custody status, he has not shown that the defendants deprived him of a hearing. Rather, based on the record, it appears that Lt. Montano did all that she was required to do. She witnessed the plaintiff's behavior on July 6, and she signed off on his Rules Violation Report. Lt. Hannah began the hearing on July 10 and, when he realized it was untimely, stopped the hearing and deemed the plaintiff's time served. Neither defendant had the responsibility to ensure that the plaintiff receive a hearing within three days, and neither defendant had the ability to place the plaintiff on maximum custody status. Thus, the defendants lacked personal involvement in the plaintiff's due process claim. See Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995).

## III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 32.

The court **ORDERS** that this case is **DISMISSED** and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment.

See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 24th day of February, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**